Mark Mandich v. Tannenhaus Good morning, Your Honors. May it please the Court, my name is Mark Mandich, and I represent Professor Walter Block, the plaintiff in this case. The New York Times would serve its readers well with fewer snatched slogans that inevitably render a narrow caricature of the one who spoke the words. That's one of the New York Times' own writing after this past election cycle about their coverage of certain issues. For sensationalism purposes, they tend to snatch words out of the speaker's phrase to render them in the worst possible light. And I'd like to start by talking about the real man, Walter Block, that was caricatured here, because the opportunities to defend his character have been few and far between. So the man that was caricatured here, I'll represent to Your Honors that he's certainly not the man that's portrayed in the article, regardless of the outcome of this case. What was the falsity, if any, that you're claiming? Well, Your Honors, if you look at what he wrote in the blog post that both parties cite, he's creating a rhetorical, hypothetical construct and saying, look, the problem with slavery was that it was involuntary. If you consider, contrary to fact, a hypothetical voluntary slavery, then that wasn't so bad because if these conditions aren't forced on someone, if they freely choose them, you don't have a problem. That's that first portion of that, the conditional premise that was left out of the article, and it renders the statements completely false. It's like Judge Costa remarked in the prior argument. Well, is it actually a falsity or is it maybe somewhat misleading? Is it really fair to say that it's false? Yes, Your Honors, I believe so. The test here looks at both Professor Block's meaning and attitude, and if the meaning and attitude conveyed by the statements, even if it is his actual words, is materially different than his meaning and attitude when he spoke them, then you have falsity. And I break that into two parts. So first you have his meaning, which is, again, the hypothetical he was constructing, which is left out. But the other part is just as important. It's his attitude. The way that the quotes are laid out, it portrays him as a slavery apologist, that he's basically saying, hey, look, you had your freedom taken from you, but so what? What's really so bad about it? You pick cotton, you sing songs, boo-hoo, cry for me, which isn't his view at all. His view was had these things been voluntary, if someone freely chooses them, then you have no problem. And he was doing so to dramatize that the real issue was the involuntary nature of the institution to make a broader point about the importance of liberty, a point, Your Honors, that's a central tenet of his beliefs, which is where I was going to begin. As a libertarian, a very devout one, he holds individual liberty at his core. To say that he supported slavery or that he describes slavery as not so bad is completely antithetical to everything he stands for. And it gets worse than that. He's been far more specific over the years. He's written – But doesn't the sing songs and pick cotton really demean what really happened? I mean people were bound together in chains. They were separated from their family members. Children were taken from parents, et cetera. I mean it's not simply that they were out there singing songs and not being paid for that. That was a very minor, small part of overall slavery. It was extremely abusive. Maybe there was the occasional slave who was not treated that way, but there were many who were. So isn't that really the larger picture here, that he's kind of making frivolous by saying they sang songs and picked cotton, but it was involuntary? That's the problem. When really there was so much physical and emotional and mental abuse beyond enslaving people that was mistreatment that is what is causing a lot of this consternation about what he said. Well, Your Honor, I think if Judge James, if I may, the point that he was making actually goes towards that idea because all of those things – I know Professor Blocks, the merit of his views, if you will, is not necessarily on trial, but all of those horribles and injustices that were perpetrated on slaves stem from the fact that it was involuntary, that they were able to do that. Yeah, but he didn't say it would be okay as long as it's voluntary. It would be okay to chain people together and take their children away and break up families and beat people. That would be okay as long as it was voluntary. He didn't say that. He said the singing songs and picking cotton, which really demeans the experience of the average American slave. Well, I – At least arguably. I mean, again, this doesn't matter what I personally think. I'm not trying to express a personal view. I'm saying this is what The New York Times is arguing. So they're saying their overall portrayal of him is accurate. He's treating slavery as somewhat of a frivolity and not the extremely onerous thing. It wasn't simply that people didn't get paid. Is it your point, though, that all of that is related to the involuntariness of slavery? It is. That the fact that you're chained together is the most involuntary of actions. So the items that were just being described are all related to the involuntariness of slavery and the terrible, terrible involuntariness of slavery. Is that what your position is? That's accurate. So does the newspaper ever say explicitly that Bloch viewed forced slavery as not so bad, quote, or something of the sort? That he viewed forced slavery as that? Well, in the passage that refers to Professor Bloch by name, it reads, Walter Bloch, economics professor at Loyola University in New Orleans, who describes slavery as not so bad. So you don't need the word forced because slavery by definition is forced. That's what the comment was. So described as not so bad is saying that he believes forced slavery is not so bad.  Yes, Your Honor. And the proof is in the pudding. The meaning comes from what a reasonable reader would take from it. And reasonable readers, most prominently Father Wilde, the president of Loyola, took that he was discussing forced slavery and that he endorsed chattel slavery and forced it against someone's free will, contradicting his own libertarian principles. So what a reasonable reader took. Where does it say he endorsed chattel slavery? Exactly what is the language at issue? In the article or in Father Wilde's op-ed that I just made? In the article, you mean? Whatever you're suing on. Okay. In the article, the quote that references my name says that he describes slavery as not so bad before going on to note that he's also highly critical of the Civil Rights Act. Both points that they make in the article abandon his meaning that freedom is the touchstone that informs both of those comments. That's completely excerpted out of the article. So also critical of civil rights or something, is that also a defamatory statement or is it just the first statement? Which particular statements are at issue? The first statement is, we believe, the one that is defamatory per se on its face. Now, the other comments give rise to – or they're actionable comments because once you have a defamatory statement on its face, then any implications that a reader would draw from the article are also actionable. Now, if you read the entire article, as I'm sure you understood, this was a proverbial hit piece on libertarian philosophy. Rand Paul had just jumped into the presidential – Which the New York Times has the right to write. Of course. They can criticize libertarian philosophy if they wish. Of course. The argument is that they can't do so in a way that libels this professor or anybody else. But if they think libertarian philosophy is ridiculous and they want to write an article about that, they can do that. Certainly. Right? Certainly. That's fair game and that's part of the robust debate that the federal government – And even attacking Rand Paul is fair game because he's putting himself out there as a potential presidential candidate. And when you do that, people are going to attack you and compliment you perhaps. Absolutely fair game, but it informs the context of the comments about Professor Bloch because the entire article is a premise of, look, these libertarians that are associated with Rand Paul hide behind their orthodoxy, but really they're pro-Confederacy. They are anti-abolitionists. But isn't Professor Bloch in favor of Woolworths being able to deny service to somebody based on their color? As a moral proposition, no. And that's something that the New York Times actually cited in their briefs in this case. He decries those practices as immoral to discriminate against anyone based on race. Again, this goes back to his points. But he believes that there should not be laws against that. In other words, whatever a person's – if the Woolworth owner is a moral person, he should open up his lunch counter. But if he's not, he shouldn't be required by law to open up his lunch counter. Isn't that his belief? It's a belief. And wouldn't that be a belief that might lend people to think that he's in this group of people that the New York Times is castigating? And if his actual words were betrayed and readers took that, that's their – that's fair game. So you're saying that if you say that he doesn't believe in laws related to such issues, you also have to say, but he thinks they're immoral for completeness. Is that your position? Not necessarily. Although that would help in this case. What would have helped is if they actually disclosed that his viewpoint stemmed from a deep commitment to the idea of individual liberty. And he's consistent in that. Individual liberty should be trampled onto his mind regardless of whether you're doing it for good or bad. The system will work out the wrongdoers. And people disagree with that, rightfully so in many regards, Judge Haines. But that's not what was portrayed in the article. So he was never able to be judged on his own merits by the reader. Instead, the New York Times snatched the slogan, and they quoted it, and it was sensational, and it had the desired effect. Let me shift gears because you're getting towards – a little bit towards the end of your time because I want to ask about 971. What is – exactly is your argument on Passmore now? Because you've written a 28-J, and your argument is somewhat evolving. So I want to be clear on what your argument is on Passmore. Yes, Your Honor. So Passmore made the kind of broad ruling that if applied in federal court to a particular state statute at issue, a Texas statute would significantly interfere with federal control of discovery in an area governed exclusively by federal law. Here we're dealing not only with a statute that does a lot of the same things as that Texas statute that was at issue, but that ruling is pretty broadly stated, and it says that control of discovery is exclusive province of the federal rules. We have an interference with federal control of discovery in Article 971 because it completely – But how does that affect the law of the case analysis and all that? Because as it stands now, the law of the case analysis is probably not on your side. So tell me how Passmore impacts the law of the case argument about arguing that 971 collides with the discovery rules and so on and federal rules. So one of the recognized exceptions to the waiver doctrine is that there's been a controlling precedent, a change in the law applicable to the case, and that's where we believe Passmore comes in. This is a controlling change in the law because if you were to hold now that Article 971, which has the same elements, you look at the Texas statute at issue, you have discovery limitations, mandatory dismissal, and mandatory attorney's fees, all of which are present in Article 971. So to say now that Article 971's discovery limiting aspects don't collide would be – would contradict Passmore's ruling. So we have a change in the law applicable to the case, and this goes along with the lion's share of cases. Of course, they're hearing these anti-SLAPP, direct collision cases they're finding. Even the Ninth Circuit, which still disagrees with this as a new shame and still good law, has stripped their – their California statute of discovery limiting aspects and metabolite. The D.C. District Court in 3M Company v. Bolter went the same way. The – a boss first-born policy group from the – Is it all or nothing? Could we say, well, the 971 rules about discovery conflict with Rule 26 at SEC or whatever, but the rule allowing for attorney's fees doesn't really conflict with anything. There are principles of federal law that allow attorney's fees, and there's ones that don't. So therefore, we'll keep that. Is it all or nothing on 971, or do we only sort of refuse to enforce the ones that directly conflict? Well, this is an area Judge Kaczynski from the Ninth Circuit touched on, and now four other judges at the Ninth Circuit who agree with him, that you can't take the state statute and sever parts of it and use them, especially not if you're trying to remain true to the state's policy goals in the first place, because what you end up with is what he called a hybrid mess where neither the federal rule nor the state statute operate as it was designed. And also, you – But isn't that more respectful of the state? We only sort of preempt, if you will, the areas where there's a direct conflict, and we otherwise respect the state's statute. Isn't that more respectful than just wiping out the whole state statute because there's one area of conflict? According to Justice Scalia and Shady Grove, no, Your Honor. His view was that it serves neither the state's policy – and Judge Kaczynski as well. It serves neither the state's policies, and it doesn't serve the policy of the federal rules, which are an integrated whole, and incorporate all these other ideas. There are provisions in the federal rules for giving attorneys fees when a party prevails and the claim was meritless. There are provisions in jurisprudence governing when discovery is required, when a motion is premature, the standard it can be dismissed by. All of these elements are covered by the federal rules, which these other courts have described as an integrated whole. Right. And we have talked, I guess at least in footnotes in other cases, that recognize the D.C. Circuit has said that the anti-SLAPP wouldn't apply, and we've recognized this in other cases. But it seems that in your case, it's already – we're already past that because of the law of the case. And so I don't know if your anti-SLAPP point has any efficacy here, does it? If you don't – if you can't persuade us on the Passmore part, aren't we just bound to move on down the road and this is not the right anti-SLAPP case, even if we were to decide to recognize the D.C. Circuit's approach? Judge, I would urge the court – I'm sorry if I cut you off. No, no, no. I want you to answer, Tom. We would urge the court not to kick this issue down the road. It's becoming a forefront issue. There's a circuit split on it now. And it is relevant in this case because we sought discovery. Right, but we have law of the case already in this case, don't we? And as Judge Smith said, I believe in – I forget the case. I'm sorry. But you recognize the importance of the fact that this is a discretionary doctrine. It doesn't bind this court. And we're dealing with an issue of what the law is in federal courts, which is of paramount importance to me, like determining jurisdiction. Here you're dealing with what the decision of law is going to be and going all the way back to Marbury v. Madison in the federal court system. That's a very important notion. I mean, they wrote the court, and that has not just – it's not just the province, but it's emphatically the province and duty of the Judicial Department to say what the law is. Judge Kaczynski also talked recently about the disruption and the extended litigation and the effect on the court's dockets that these disputes are having, and they're coming up a lot. And it's important to future litigants, and it's also important to this case because we've been denied discovery under the statute, and this case has not proceeded in any regard except for to this court over two years now. All right. Your initial time has expired, Mr. Mandish. Thank you. And you saved time for rebuttal? Yes. Ms. Mintz? Good morning. I'm Laurie Mintz on behalf of the defendants of Hallie's New York Times et al. May it please the Court, when Professor Block filed his initial complaint in this matter in late 2014, he made two important admissions. First, in the opening paragraphs of his complaint, he alleged that the article at issue contained not one but two passages about him and that those passages together and indeed, quote, the entire article when read as a whole, quote, defamed him. In his complaint, Professor Block also alleged repeatedly that he was defamed by the article because it, quote, gave the impression that Plaintiff is a racist, quote, used innuendo to paint him as a racist, and, quote, falsely insinuated that Plaintiff holds racial prejudices. Since that initial filing, Professor Block has attempted to reframe his claims by arguing that his claims are about the second passage only, and he has attempted to reframe his claims as something other than defamation by implication. The shift in his focus is one of expedience. If the two passages are read together and in the context of the entire article, his claims fail, and if his claims are for defamation by implication, they fail. The district court acknowledged the change in Professor Block's focus over the course of the case and rejected it. He found that three of the necessary elements of Professor Block's claims were lacking, falsity, defamatory meaning, and actual malice. Do you agree, don't you, that quoting out of context can constitute falsity? Yes, I do agree with that. I think if you look at Professor Block's arguments, he tries to liken this case to an if-then statement, and he gives the analogy, if speaking the truth is a crime, I am a criminal, and he quotes the church, he'll quote, democracy is the worst form of government, except for all the others. And if you said, I am a criminal, instead of if speaking the truth is a crime, I am a criminal, or you said democracy is the worst form of government, then you have entirely changed the meaning. In each of those examples, one idea is being expressed. In the first, the idea is, I speak the truth. In the second, the idea is, democracy is the best thing we got. And so if you chop those sentences in half and only quote half of them, you've completely flip-flopped the meaning. Here, however, Professor Block holds two views. His first view is that slavery, the only thing wrong with slavery, is that it was involuntary. And his second view is that every other aspect of slavery, the picking cotton, the singing songs, the being fed gruel, was not so bad. And so when you convey one of the – his complaint is – I don't think that he believes that the only thing wrong with slavery is that it's involuntary. I think he also believes he thinks it's immoral. We're talking about legal versus morality. I mean, he has complex views, like many people do, about slavery. I mean, perhaps many people don't have complex views about slavery, but he certainly does, I guess. So I think he's saying he thinks it's wrong because he thinks it's immoral, but what he's talking about is legality of whether you can conscript yourself or something. I'm trying to parse it myself the best I can. I think if you read all of his writings on this issue, he says things like, quote, the only thing horrid about slavery is that it was involuntary. He says otherwise it was, quote, innocuous. He even says in a more recent publication, I think after this case was decided the first time, he says, let us now double down. Previously I wrote that slavery in the absence of violence and compulsion was not so bad. That was an inaccurate understatement. The truth of the matter is that under these conditions, slavery would be a positive good. There I said it. I will say it again. Slavery would be a positive good. Make that what you will, New York Times and other enemies of freedom and logic. Do you concede that the article would have defamatory meaning if it did indeed communicate that Block viewed forced slavery as not so bad? If the article communicated that he believed that forced slavery was acceptable. Was not so bad. Well, there again you're talking about, is he talking about the daily life of a slave? That's my question. Do you concede or do you not concede that the article would have defamatory meaning if it communicated that Block viewed forced slavery or just slavery as not so bad? So I think in that case, there's a pretty good argument that you've established falsity. But I also think in that case, he would fail the defamatory meaning aspect. Because under Louisiana law, the law is clear that there is no defamation by implication. And so, for example, in the Sassoon case, you have these lawyers and there's a television reporter who quotes in his story that the lawyers don't have a working phone number. And then later in the Fitzgerald case, you have the director of the state agency that supervises substance abuse counselors saying 17 licenses issued to substance abuse counselors were revoked as invalid. And as he says it, he holds up Ms. Fitzgerald's license and her name right across the license. In the Sassoon case, the statement was false. Those lawyers had a working phone number, and the reporter knew they had a working phone number because he had talked to them by phone. In the Fitzgerald case, it was technically true that Ms. Fitzgerald's certificate had been revoked as improperly issued, but it was immediately reissued. And at the time the statements were made, it had been reissued. So in both of those cases, we have a false statement outright false, and then we have one that carries a false implication. And in both cases, the Louisiana Supreme Court said they cannot recover because what they're complaining about is a defamatory implication that came from the statements. In Sassoon, the implication was that these lawyers were shady lawyers. In the Fitzgerald case, the implication was that Ms. Fitzgerald was acting as a counselor without proper authority. And here, his complaint is that the article portrayed him as a racist. So by necessity, it's a case for defamation by implication. So in response to your question, Judge Elrod, I think that while if you looked at the second passage alone and it said forced slavery was not so bad, you may well have falsity, but you will still have a failure of the defamatory meaning element. Do you need the word forced because doesn't slavery tend to mean forced unless it says voluntary in front of it? Well, Professor Block is the one who's developed this construct about there potentially being different kinds of slavery. I mean, he has all of these writings about how you might voluntarily become a slave because you get paid and you need the money to pay for it. Right, but in the general understanding of the term, isn't slavery itself involuntary? And so you don't need the word forced, do you? I mean, I think the average person is going to assume that when you're talking about slavery, you're talking about slavery as it existed in pre-Civil War America, and that, as we know, was forced slavery. Because when people would conscript themselves into service in history or whatever, that wasn't called slavery or something. That was called something different. It's called indentured servitude. Yes, and so we use slavery to mean that you're forced into it by definition, don't we? Yes, we do, and I would urge to the panel that you review Professor Block's writings in the 2015… I mean, I think your point is even if we did misrepresent this guy, I mean, anybody who really looks at his writings is going to think he's a little out there, and so what's really no harm, no foul kind of thing. That strikes me as something a jury is supposed to do. They may ultimately conclude that you all lied, meant to lie, did so with malice, but didn't actually harm his reputation because they conclude that his reputation wasn't that much to begin with. A jury could conclude that. I'm not agreeing with that. I'm just saying a jury could conclude that. But that isn't really the office of a pretrial sort of motion, so it seems to me that all this stuff about his other writings can only help illuminate whether this statement is true, not whether he has a reputation of being different in his viewpoints. We'll just put it that way. Agreed, and I think that his writings do establish that the statements, the two statements read together and in the context of the entire article are not false, and that is a determination. Okay, but I have a problem with this read together. I will tell you, I read the New York Times, and when they have a long, long article and they've talked about somebody at the beginning, and they later, so they'll say, Katharina Haynes, United States juror could judge, said, blah, blah, blah, blah, and then later on they'll say, Ms. Haynes, comma, the judge, comma. To remind the reader of who this person is because you forget, you've read an article that has a bunch of names in it. By the time you get to page three or four or paragraph 52, you've forgotten who this person is. And so to me there's no way for the reader, no one reads these articles that way, the way where you would scrutinize it. Even this president of the university didn't figure out that the economist back on paragraph two or whatever is the same guy as Block on paragraph 52. I'm forgetting the exact numbers, but it's quite a ways after. And so it seems inconsistent. I understand you're saying he put the two together, but to me as a reader of long articles in New York Times and other papers, I have to go back and go who's this guy again unless they remind me because people don't tend to remember names, particularly his name wasn't even given in the first paragraph. But this is a legal question, and Louisiana law is quite clear that when you're assessing falsity for purposes of a defamation claim, you are required as a matter of law to read each statement together with the other statements in the piece and in the context of the article as a whole. And so in the Britton case, for example, the article said that Reverend Britton had been awarded a couple of six-figure grants when in reality the grants had been awarded to an organization over which he had operational control. In the Dyer case, the defendant said that Mr. Dyer was an ignorant man who let the public think he is a lawyer when in fact he was a lawyer. And in the Cortez case, the article said that Mr. Cortez had raped a woman when in reality it was Mr. Carpenter who had committed the crime. And in each of those cases, the court said that while the single sentence by itself might not convey the whole story or might even be false, the claims nonetheless failed the element of falsity as a matter of law because you are required to read the entire article as a whole. But there's nothing that says that paragraph 2 is the same guy. You have to imply that. And so it seems to me if they had said Walter Bloch, an economist, says slavery wasn't so bad except that it's involuntary, and they said that in paragraph 2 and then later on they used the shorthand of Bloch, the economist who said not so bad, blah, blah, blah, I think that would be fair because it's referring me back. I need to go back and look at what this guy said. But here I have to infer that we're talking about the same guy. And you've just finished in this whole article showing how there's a lot of people, according to The New York Times, in the Libertarian Party who hold views The New York Times doesn't think are very good views. So there's nothing. This isn't a whole article about just one guy. Agreed, although I would say that describing slavery as not so bad is sufficiently striking that a reader who encounters that in the first paragraph is going to realize that there's not two economists running around saying slavery wasn't so bad. The president of the university didn't get it. You can tell that from that letter that says this is contrary to libertarian values. It says everybody should have freedom. Obviously the president didn't think that that paragraph way back at the beginning was referring to Professor Bloch or he wouldn't have written that. Well, and we don't know what Father Wilds was thinking when he wrote that letter. We don't even know if Father Wilds read the whole article. We don't know whether someone told him about the article. We haven't talked to him about that. But if you read his letter, what he says is he calls Professor Bloch out for saying something that is insensitive. He says you're just making provocative statements in order to, quote, gain attention. And he says where is your evidence by even hinting to endorse slavery? So even he recognizes that Professor Bloch isn't endorsing slavery. He says by even hinting to endorse slavery, you seem to be contradicting your libertarian viewpoints. But I would add that even if you look at the second passage by itself, you see that the not-so-bad language is followed immediately by a description of Professor Bloch's objection to the Civil Rights Act on the basis that it violates the right of freedom of association. So again, even in that passage, the article is reminding the reader of the essential premise of Professor Bloch's views, which is that he views the right of freedom of association as the most important right. It just seems, though, that saying even hinting to endorse slavery and forced against someone's free will is directly contrary to the professor's viewpoint, which is consistent with his view of libertarian philosophy that against the will means that it's not free. So the fact that it's misunderstood is not a positive for you. It's a negative. But I think if you look—and I don't disagree with that point, except that I would say if you keep looking in Father Wilde's letter, he also seems to misunderstand Professor Bloch's views about the Civil Rights Act because if you read what he says there, he says, well, blacks weren't forced to go to lunchroom counters. You're saying that the Civil Rights Act is wrong because it violates the freedom of association, but blacks weren't forced to go to the lunch counters, which shows that Father Wilde perhaps didn't read the article because that's not Professor Bloch's view on that point. Professor Bloch's view on that point is that Woolworths is the victim of the Civil Rights Act because they were forced to serve. But at best, it's mixed. The president's view is mixed. It doesn't help advance your part of the case. And again, I would say that Father Wilde is not the average reader. He's the president of a university. He's responding to comments that appear in the New York Times. All the more reason why we would assume he did read the whole article before he would write a letter. I mean, before you're going to call out a professor at your school, it would seem like, at the very least, you wouldn't just rely on what the Twitterverse is saying about it, that you would actually read the article. So if we're going to say this person isn't an average reader, I think that works against you because the average reader isn't going to remember paragraph 2 by the time they get to paragraph 50-something. Certainly not the way you're asking them to remember and make the inference that we're talking about the same guy. Oh, not so bad. I heard that before. That must be the same guy. Oh, so the guy, the economist before, must be Walter Block. In an article, the whole point of which is to show there's this soup of people that are members of these institutes and whatever that hold beliefs that the New York Times thinks are strange. We'll use that characterization of what the New York Times is trying. And therefore, Rand Paul, who associates with these people, is not a good candidate for president. That's the import of the article, it seems to me. I disagree with that assessment of the article as a whole. I think what the article asks, it looks at Rand Paul's upbringing as the son of Ron Paul and his immersion in this libertarian movement and then asks the broad question about whether that early exposure to libertarianism has perhaps made Rand Paul tone deaf and whether he is going to be able to separate himself from some of the more extreme views of libertarians from those that I think enjoy wider appeal. I think that's the import of the article. So is the article that libertarians are racist, is that the... I mean, is that... That's certainly not the theme of the article. Okay, I'm just trying to... But even if it were, that would be a matter of opinion that they would have a first amendment right to express. But that's not the theme of the opinion. And I think, Judge Haynes, to your point, you seem to be saying that if the first passage had said Economist Walter Bloch says slavery's wrong because it's involuntary and otherwise it's not so bad, you pick cotton and sing songs, and then they have that second passage that again said Walter Bloch, that that would at least inform the reader that we're talking about the same person. And even if I were to accept that premise from Your Honor, I would say that that brings us to our actual malice point, which is he's a public figure and he's required to demonstrate actual malice, which means he's required to demonstrate that we intentionally omitted his name from one passage and not the other. Well, that's why I was saying... And so I would say that at most this would be a case of negligence and failure. Ms. Spence, that's why I was saying, I mean, I've read enough long articles in The New York Times and elsewhere to say that is really a standard where they say the name first and then later they'll do a shorthand, like they'll give some long title, Joe Blow, President of the this, that, and this, and that. Then later they'll say Joe Blow, the President or the Executive, the NEHA Executive or something like that. They'll do a shorthand to remind you of who this person is. And here they didn't do that. And so it does... I mean, the question is, can that support a conclusion of malice in the context of this whole article? I'm not sure that I can say as a matter of law it doesn't. That's the problem to me. You're asking us to sort of assume the good motives of the paper, and I don't know that we're required to assume that. He has a burden, yes, but this is at a preliminary stage. So he doesn't have to persuade us, he just has to raise a fact issue. And we're not... I mean, I think that the standard here is whether assuming the allegations in the complaint are true, that would give rise to a finding that The New York Times intentionally made false statements about Professor Block. And I don't even think that's a close call. I mean, if you look at the Time, Inc. v. Pape case, in that case, remember that there was this government study about police brutality in the early 60s, and there was an article in Time magazine that reports on the study, and included in the study was a description of some allegations that had been made against the Chicago Police Department. When Time rewrites the article, they write it as if the government has made a finding that those allegations were true, which they were just allegations in a civil suit. And on that record, the U.S. Supreme Court said, there's no actual malice here. Okay, let me really quickly ask you about Passmore. What is your response to his argument that Passmore provides an intervening law change that allows us to overlook any law of the case kind of waiver argument? Passmore, I don't think, is an intervening change in controlling law because it addresses a different statute that has similar but distinct features to it. But nonetheless, we have two things going on here. First, we have a failure to raise an issue during the entire first part of this case in the trial court and in the court of appeal. The issue of whether 971 collides with Rule 56 was never raised until a 28J letter after all the briefing was complete. And in that 28J letter, not only did he raise an issue for the first time, he contradicted his prior position on that issue and the prior panel of this court held that he had waived that issue. So we have two things going on. We have the traditional waiver rule, which says you don't get to raise issues in Appeal Part 2 that you didn't raise in Appeal Part 1. And then we have a law of the case issue, which is a prior panel of this court has already made an affirmative finding that Professor Block waived. And so even if Passmore was an intervening change in the law on the first waiver point, it most certainly is not an intervening change of law that would upset this court's prior panels holding on waiver. Have you made any argument that Article 971 is consistent with the federal rules with respect to burden shifting, discovery attorney's fees, or extra pleading requirements? I think we did address that briefly. Where did you address that? In our brief. I think it's a very short passage, and I think we devoted more time to the waiver issue, but we did address that. So it's your position that it's Article 70. If we look at it straight up, if we don't have all these other barriers, is it your client's position that Article 971 is consistent with the federal rules on all these aspects? My position is that Rule 56 and 26 and all of the federal rules that are implicated can peacefully coexist with Article 971, which is the interpretation that the Ninth Circuit and the First Circuit and the Second Circuit have given it. They're not identical, but they can peacefully coexist, as is evidenced by the fact in Louisiana State Court. Louisiana has very similar rules to Rule 56 and Rule 26, and we have those in our Code of Civil Procedure, and yet those provisions peacefully coexist. You've gone over your time, but that's because you were answering questions, and I'm going to ask you one more, and then we'll give Mr. Mandish a little bit of extra time as well. This is a little bit repetitious, but I want you to summarize, because at this stage of the proceeding, what you have to show us is that there are no disputed issues of material fact. Just give us 30 seconds to summarize how it is that you say on this record that there are absolutely no disputed issues of material fact. All right. With respect to falsity, the article portrays Professor Bloch's views. The second passage, even read by itself, articulates his view that he described slavery, the daily life of a slave, as not so bad. With respect to defamatory meaning, Louisiana law could not be clearer that there is no cause of action for defamation by implication, and by necessity, Professor Bloch's claims are claims for defamation by implication, i.e., the article implied that he supports slavery and is a racist. And with respect to actual malice, I would submit that if you look at the first passage and the second passage together, you will see that at most, the failure to fully articulate his philosophy in both passages would give rise to a finding of negligence and not actual malice. All right. Thank you, Ms. Nance. Mr. Mandish, you've saved time for rebuttal. Well, let's give Mr. Mandish six minutes instead of four. Thank you, Your Honor. Judge Haynes's work jury-struck me during the opposing counsel's argument. This entire case from top to bottom is the one where there are so many questions that we've raised evidentially. Speak up again and pull that microphone. There you go. And the New York Times wants all doubt and inference resolved in its favor at this stage, which is contrary to the rule that has to be applied. Now that we know that Rule 56 as standard applies, we have a very baseline showing we did all we could without discovery to do so. In particular, the New York Times wants you to say that there's no question, no reasonable reader could think that Professor Block was speaking in conditional terms, and no reasonable reader would read that article and find that he wasn't speaking in those conditional terms, and that he actually did say forced slavery was okay. That takes a lot of inferential leaps that this court is not permitted to do at this stage of the proceeding. With defamatory meaning, this kind of confounded me this entire litigation that this has been as big an issue as it is. And I may just be totally wrong, but to quote someone in my mind that said slavery was not so bad, let me put it this way, if I were to quote, to your honors, that my opposing counsel said slavery was not so bad, I don't think she would get up there and say, hey, well, that's false, I didn't say that, which it is, this is a hypothetical race harm, but she would not say that that couldn't possibly damage her reputation. But her argument isn't that, it's that in order to do the damage, you have to imply something from that, because slavery is illegal in the United States, so we're not arguing the merits of slavery in and of itself. So her argument is it's the implication that somebody is racist or in some way bigoted or something along those lines that gives it the heft, and she's saying that violates Louisiana law because you can't have defamation by implication. So that's the argument. It's not that people think that's a good idea to go around saying that, but rather that you have to make an implication from that to get to the defamatory meaning. So respond to that, please. Correct, Your Honor. Her argument is that they don't call him a slavery supporter, they don't call him a racist. So you have to infer that from the article, you have to get that implication, and so that's not actual because he's a public figure. But the actual quote on itself, and we make the point in the brief that it would be as bad as saying that rape or child molestation is not so bad. Just that quote. And again, falsity is a separate issue, so we're just looking at whether that could, in the mind of a reasonable reader, carry a meaning that would tend to harm Professor Block's reputation. As we argued in brief, to argue that that does not or is not capable of being read by a reasonable reader as defamatory is to argue that the Earth isn't round. Is it fair to say, although people are saying that, but in any event, is there a context where people have made a statement that others find controversial or bad and that person then loses their job? I mean, we've had sort of this Twitter shaming of people, and I'm not saying it's good or bad or right or wrong, but simply that this has occurred where somebody, some newscaster, somebody says something and a large number of people find this objectionable and the person is then fired or loses their position or reputation based on that one sentence. Are you saying this falls in that category where the sentence, kind of having made the statement, creates this kind of problem, regardless of what it implies or doesn't imply about the person, regardless of whatever else we know about that person? Yes. To hold a viewpoint that forced slavery, slavery and force against someone's free will is not so bad in any just society, but particularly in our modern society, is unpalatable to others. It is going to cause others to shun you, to ridicule you, to disassociate or deal with you. That's the definition. That belief by itself, without regard to whether there's a racial component or anything else, you're saying we don't need to make an implication. If he makes that statement, he's going to have a problem. That's your argument. Slavery without his hypothetical premise, without attaching the notion that he ascribes to it, it's voluntary. Forced slavery, not being so bad, which, as Judge Elrod noted, is implied when you only discuss slavery and don't make that important additional footnote, citation, definition of it, is an objectionable viewpoint, and that is defamatory to quote someone as forcing any kind of support. What about the malice? What about the idea that even though the average reader might not have bothered to go back to paragraph 2 or whatever and make the connection and all of that, and it's kind of sloppy work on the part of the New York Times, it's inconsistent with malice because they do have it in there. So maybe they're negligent, maybe they're sloppy, whatever, but how is that malice? Again, we only have to show a genuine issue of fact at this stage, and we're particularly handcuffed on the malice issue. The New York Times wants to say we can't prove anything more than negligence while precluding us from getting any evidence to show what they knew or disregarded when they wrote the article. We sought discovery even under Article 971 standard from the start. We tried to show good cause. The jurisprudence recognizes. Ingray Baxter from the Western District, the Ninth Circuit, has recognized this multiple times. You can't possibly prove malice without getting the author's notes, without getting their depositions and finding out what they did know. So that issue is premature at best, or at worst depending on which way you look at it. But we actually under Masson have shown enough to show a genuine issue of fact as to malice because in Masson that was inherently tied to the falsity question. Just showing in the context of a quotation that you have falsity and that you materially altered the speaker's words got them over the hump for malice, and that was the standard they set forth in Masson. So we actually have shown enough even with our hands tied behind our back. I gave Ms. Mintz an opportunity to kind of summarize. You can have 30 seconds also just to summarize your case for us. Okay. Well, on the defamatory meaning question, again, a genuine issue, we kind of pounded on that for a minute there. But the main point here, I think, is the crux of the dispute is falsity. If we have that, I think we have a genuine issue. They want this court to find that there's no room for argument, there's no room for inference, that what Professor Block said is what was quoted in the article. That takes some leaps that are all meant and required to be found in Professor Block's favor here at the very least. We think that we've shown that they materially altered his meaning, no question. But we've certainly sustained the threshold summary judgment burden. All right. Thank you. Thank you, Mr. Banducci. The case is under submission. Next case.